**GRASSO v. CROWHURST et al.**
Civ. No. 3680.

District Court, D. New Jersey.
Feb. 15, 1945.

Isserman, Isserman & Kapelsohn, of Newark, N. J. (Sol D. Kapelsohn, of Newark, N. J., of counsel), for petitioner.

Irving Abramson, of Newark, N. J., amicus curiae for New Jersey State Industrial Union Council.

Robert Scherling, of Newark, N. J. (Edward F. Rosiny, of New York City, of counsel), for respondents.

FAKE, District Judge.

This proceeding is founded on the provisions of the Selective Training and Service Act of 1940, Title 50 U.S.C.A. Appendix, § 308. The petitioner is an honorably discharged soldier of the United States Army and seeks to return to the position of a tacker at respondents' tannery, which position he left on induction into the Army.

Two issues of fact are involved predicated on the evidence, and it may be well to explain more fully the factors which have resulted in the pertinent conclusions arrived at.

The first question to be answered bears on petitioner's fitness for his position and it is spelled out of the wording of the Statute, supra, Sec. 308(b) (2), as follows: Is petitioner "qualified to perform the duties of such position"? If he is, he is entitled to return to his position if he made seasonable application therefor. Obviously, this raises a question of fact and the burden of ascertaining the answer in the absence of a jury, falls upon the court.

It is urged that petitioner suffers with flat feet coupled with eversion or imbalance and this condition, aggravated by his service in the Army, disqualifies him. The evidence stands uncontradicted that petitioner has had flat feet from a very early age. He was not able to function efficiently on long hikes while in the Army and could not fulfill the strict Army requirements in that regard. There is little, if anything, in the evidence however to lead to the conclusion that his Army service caused his flat feet or that this condition was seriously aggravated or made permanently worse by his Army service. It is altogether reasonable to conclude from the evidence that the condition of his feet was substantially the same when he left his employment as when he was mustered out of the Army. There is no evidence whatever from which it might be found that he had been inconvenienced in his position at the plant by the condition of his feet before he was inducted into the Army.

In instances where flat feet are congenital no suffering or disqualification would necessarily ensue as is evidenced by the fact that many outstanding athletes have flat feet and suffer no detriments therefrom. If flat feet are after acquired however, the chances are, more often than not, that they would cause pain and discomfort and to that extent constitute a disqualification. It is clear from the evidence here that this petitioner either has congenital flat feet or a condition so closely akin thereto as to present the same symptoms. The evidence is not seriously disputed that his flat feet date back to early infancy. He commenced to play football when he was fourteen years of age and he knew then that he had flat feet but continued to play until he was twenty, evidencing no discomfort from his feet. Moreover, he has played golf regularly from 1932 down to the present time. It does not seem plausible to me that one would voluntarily engage in such sports if he suffered any pain from exertions on his feet. Never, during all this time and down to the time of his induction in the year 1943, had he visited a doctor because of his feet nor had he ever worn arch supporters. During the course of the trial we went to respondents' plant and there witnessed an extended demonstration of petitioner's alertness on his feet in the operation of tacking skins and for all that was disclosed, he held his own with the best of

them, evidencing no lack of agility, inconvenience or pain whatever.

As to eversion or imbalance coupled with his flat feet; while it does appear that he has eversion, it does not appear that this defect is of sufficient moment to disqualify him for his position. Notwithstanding all the evidence to the contrary, I am convinced from the conduct of the petitioner over the years, his willingness to assume the job, and from what I saw of his activities, he is not disqualified for his position as a tacker in respondents' tannery.

It being shown that petitioner had suffered the specific defect of flat feet and eversion without inconvenience or suffering in his employment down to his induction, and later returned in the like condition, nothing else appearing, he should be restored to his employment and placed in status quo ante. Such would seem to be the spirit and intent of the Act. If, after his reinstatement the defect then appears to disqualify him the employer might exercise the same right to discharge him as might have been exercised before the induction.

The second question is: Did petitioner apply for reemployment within the intent and meaning of the Act, supra, Sec. 308 (b) (3), by making application therefor within 40 days after he was relieved from military service?

In this connection it appears that petitioner was discharged from the Army on October 4, 1943. On the 29th of the same month, and well within time, he called on Mr. Charles M. Crowhurst, one of the respondents, and they had a conversation. The exact purport of which is of utmost importance. Petitioner testified as follows:

"I asked him—when I first went into the office, I wanted a leave of absence, and he said 'Before I could give you'—

"Q. Just what did you say to him, as well as you can remember? If you can, will you try to repeat the exact conversation? A. I walked into the office and *I asked Mr. Crowhurst if I could have a leave of absence.* (Emphasis added).

"Q. And what did he say to that? A. He said, 'Well, Grasso, before we could even discuss a leave of absence or your job back, you will have to go to the company doctor'.

"Q. Well, at that point what did you say to that? A. I said 'I am willing to go to the company doctor.' * * * He

sent me to Dr. Crecca. * * * That's the first time I saw Mr. Crowhurst. * * *

"Q. Did you see Dr. Crecca? A. A few days later. * * *

"Q. Did Dr. Crecca examine you? A. Yes, sir. * * *

"Q. What did he say? A. Dr. Crecca told me that my physical condition was very poor, that I wouldn't be able to work any more, and that—* * *. He told me my feet were very flat and that if I continued working, the veins, he mentioned some veins, will come out from my legs and cause me trouble. * * * Dr. Crecca told me to go back to see Mr. Crowhurst. * * *

"Q. Did you go back to see Mr. Crowhurst? A. Yes, sir. * * *. Possibly a few days; a few days later. * * *

"Q. And what was your conversation with him? A. I went into the office and I told him that if there is going to be that much trouble for a leave of absence, I don't want the leave of absence; I will take my job back; I want my job instead of the leave of absence. * * * Mr. Crowhurst said that I couldn't have my job back because of my disability, physical disability. * * * I told him that according to Selective Service I was entitled to my job back, and Mr. Crowhurst said there isn't a law in the country that could force him to take me back."

Respondent Charles M. Crowhurst agrees in his testimony that the first application made to him by petitioner was for a leave of absence only, but denies that there was any such conversation as that testified to by the petitioner as taking place after petitioner had visited the doctor or on any other later date. In this connection, the following testimony of Mr. Crowhurst and of his secretary Mrs. Hammell (she was present on each occasion) is pertinent: (Charles M. Crowhurst). "Well, Mr. Grasso came in and I asked him if he was home on furlough and he said no * * * that the Army routine had broken down his feet to the point that he received a medical discharge. * * * I asked him what I could do for him and he said that due to this condition, that he was physically unable to resume his job as a tacker, or in fact any other job in our tannery, and he would like an indefinite leave of absence. Well, I told him that was out. * *.* that sometime previous to this we had agreed with the union that leaves of absence for a definite period would be granted

only on the recommendation of the company's physician after physical examination.[1] I then went on to suggest to Mr. Grasso that he pay Dr. Crecca a visit, and he agreed to do so and left. * * *

"Q. Did he at any time during the course of that conversation ask for reinstatement? A. No.

"Q. To his employment? A. He did not. * * *

"Q. Did you thereafter see Mr. Grasso? A. Yes, a few days later Mr. Grasso came back to the office * * * and told me he had been over to Dr. Crecca's office, and on the basis of the examination and what had happened to him in the army, he would like a release so that he could obtain a job where he could be off his feet. * * * I told him I did not think the release was necessary but if it was necessary I would be only too glad to give him one. * * *.

"Q. And did he on that occasion ask for reemployment? A. He did not."

(Edith A. Hammell) "Mr. Grasso came in the office and, after saying hello to Mr. Crowhurst, Mr. Crowhurst then asked him if he were on a furlough. Mr. Grasso said no, that he had been discharged from the army because his feet had broken down while he was in the army. He then asked Mr. Crowhurst if he would give him a leave of absence. Mr. Crowhurst then asked him how long a leave of absence he thought he would need. Mr. Grasso said, 'Well, at the time, I am physically unable to do the work because of my feet. I can't do any position in which I would have to stand on my feet, and I would like to have a leave of absence in order to get my feet back into shape.' Mr. Crowhurst asked him how long a leave of absence he would want. * * * Mr. Grasso said, 'An indefinite leave of absence.' Mr. Crowhurst then told him that he couldn't give him

an indefinite leave of absence, and the only leave of absence he could give him was a definite leave of absence, due to a physical examination by our company doctor, which had been the agreement between the union and the company, for any definite leave of absence, Mr. Crowhurst then asked Mr. Grasso if he would go to Dr. Crecca for an examination, and Mr. Grasso said yes. * * *

"Q. And did you thereafter see Mr. Grasso at the plant? A. A few days later Mr. Grasso came into the office * * * and said, 'Well, that's that. I would like to have a release. I can't do any work where I would have to stand on my feet. I would like to have a release so that I can get a position sitting down, where I will be off of my feet.' Mr. Crowhurst then said he didn't think that was necessary but if he wanted it he could have it. With that, Mr. Grasso left the office.

"Q. And did Mr. Grasso in either the first or the second conversation at any time request immediate reinstatement to his former employment? A. No, he didn't."

█ Does the request for a leave of absence standing alone include a request for a return to a position? Obviously, to ask for a leave would imply that the one making such a request was presently employed in a position from which the leave is sought. My view of it is that such a request amounts to nothing more than asking the employer to simultaneously reinstate the applicant and give him an immediate vacation. It is not a request for immediate reemployment. To construe it otherwise would be to permit the applicant to extend the forty day statutory limitation fixed by the Act, therefore, it cannot be found that petitioner applied for reemployment on his first appearance before respondent on October 29, 1943.

---

[1] Excerpts from letter of Union Agent Nusser, dated October 27th, 1942, read as follows:

"I am writing to you in regard to the seniority list that you furnished us with. I think that some of the misunderstanding in regard to this list is due to the fact that at various times men have either quit their jobs, or obtained leaves of absence, and then later on came back to work.

"I have a suggestion that I think would help us to avoid misunderstandings in the future. After this, when any leaves of absence are granted, they should be given for a definate time limit, and if the man does not return in that time, he is regarded as quitting the job and loses his seniority. I suggest that either leaves of absence, when asked for, be granted to everyone on this basis, or that we agree no leaves of absence should be given at all. This will help to avoid any misunderstanding in the future if all the men know when they leave Crowhurst for another job they are quitting the job and lose the seniority that they have. That is, if and when they return to the shop, they will be at the bottom of the seniority list. Please let me know whether you agree with these suggestions, or what your ideas are on this subject."

After mature deliberation on the evidence bearing upon what petitioner said and what respondent said at the second meeting, the time of which is fixed by the evidence as having taken place a few days later, I am of the settled opinion that petitioner has not sustained the burden of proof required to show that he then applied for reemployment. His testimony, that he said after referring to his medical examination, "I want my job instead of the leave of absence" stands alone and uncorroborated. Respondent's testimony to the contrary ·is that on that occasion he did not ask for reemployment but merely for a release which he thought he needed for employment elsewhere. Respondent's testimony is corroborated in this regard by the testimony of Mrs. Hammell. The testimony having been adduced in my presence, I had an opportunity to evaluate the credence to be given the witnesses and my impression is that taking the one side against the other, the conclusion here must favor the side where corroboration appears. Therefore, I find that on the second meeting of the parties, petitioner asked for a release and not for reemployment.

We come now to a consideration of an agreement which existed between respondents and Local No. 27 ·of International Fur and Leather Workers Union relating to leaves of absence. In this connection, it appears that difficulties had arisen among employees in the plant in the year 1942, because of leaves of absence and their bearing on the seniority list. On or about November 3d of that year, an agreement on the subject is spelled out between the parties, partly by correspondence and partly by the conduct of the parties. The duly authorized Union agent called the matter to the attention of respondent by a letter dated October 27, 1942, in which he wrote: "After this, when any leaves of absence are granted, they should be given for a definite time limit, and if the man does not return in that time, he is regarded as quitting the job and loses his seniority." To this letter respondent replied on November 3rd, saying: "Leaves of absence, with the exception of those who are in the armed forces, cannot be granted at this time to any employee except on the recommendation of and a result of an examination by this Company's physician." While the suggestion or offer made in the letter of the Union agent was not expressly accepted in respondents' reply and no express accept-

ance of the added factor of physical examination submitted by respondents appears, the fact that the correspondence ended there indicates that the minds of the parties had met in conformity otherwise further negotiations would have followed. I therefore conclude that such was the agreement. However, petitioner cannot be injuriously affected by the absence of a favorable physician's certificate nor can the respondents' position be strengthened by its absence. Such a requirement would be in conflict with and greatly narrow the spirit and intent of the pertinent provisions of the Selective Training Act, which does not require such a certificate.

As to the testimony of the Union agent, Mr. Joel Widom, wherein he said he telephoned to respondent on November 2, 1943, as follows: "I asked Mr. Crowhurst why he did not reinstate Mr. Grasso to his job. I told him that the company and the Union were morally bound to make every effort to reinstate discharged servicemen. It was the position of Mr. Crowhurst that Mr. Grasso was physically incapable of performing the job, and he based his position on the statement of Dr. Crecca to whom he had sent Mr. Grasso." While it appears from the testimony of petitioner that he was present with the business agent when he telephoned as above quoted, the telephone conversation is flatly denied by respondent. An examination of the letter of the business agent dated November 17, 1943, and respondents' reply thereto dated November 23, 1943, lend weight to the view that no such conversation had taken place prior to the dates of these letters. The letter of the agent seems to open the subject for the first time insofar as he was concerned. He opens by saying: "I am taking this means of informing you that Joe Grasso * * * desires to go back to work in your plant." This certainly does not read as though there had been a prior telephone conversation, and referring to respondents' reply, it is noted that a full explanation of respondents' attitude is given as though for the first time and again no reference is made to the alleged prior telephone conversation. These letters really destroy the idea that there had been a prior telephone conversation on the subject between the agent and respondent.

█ Weighing all the evidence and considering the probabilities, I am constrained to find that petitioner failed to comply with that provision of the law which required

him to make application for reemployment within forty days after he was released from military service. An order to this effect will be entered.